The first case on the call is Henry Harris v. Harris. Arguing on behalf of the account is Clayton Wotel. And arguing on behalf of the gasoline is Joel Oswald. Thank you. Mr. Wotel. Good morning. It's nice to be back here for an argument. It's been a long time. Unfortunately, I think I have to begin my argument with an apology for a mistake and also an oversight. In my brief in the appendix, when you catch the judgment for dissolution of marriage, it's actually missing two pages. Between appendix page 9 and appendix page 10, there should have been two other pages, which are in the record at the clerk's pages 399 and 400. It's apparently in the copy. Some pages must have gone through together and we never caught it. So when you look at 8-9 and go to 8-10, there's two pages in the middle. I apologize for that. They are in the clerk's records 399 and 400. The next thing I want to discover is something that you may end up with. You're just saying it's a waiver, but I think you have discretion to hear it and consider it and base your opinions and decisions on the record. Generally, in handling appeals, I deal just with the record. I don't talk to the clients to any great extent or listen, but I have a client who's been telling me that there's a mortgage missing and not accounted for or done anything with in his file. I've been telling him I can't do anything to help you because it's got to be in the record. Last night reading, I found it in the record three places. I want to point out that in my client's testimony, he testifies about the loans against the properties that are in the land trust. There's three properties in a land trust. There's three in a land trust that contend our non-marital properties. One on Point Drive, one on Park, and one on Lake. He testifies about loans against them in amounts, but I didn't pick up on what he was saying very well. Page 58 in the transcript is testifying as to his mortgage. It goes over $59,000, those pieces of real estate. Does the property have its own mortgage on it? Yes, it does. He says the amount is $110,000. Later he says, he answers a question, now you have a loan against the beneficial interests of the land trust, correct? He says that's correct. Asked if it's an amortized loan. He says no, it's a revolving line of credit. I guess I'm mistaken. He took those two things to be the same thing and they're not. And then later he testifies, he testifies twice. He testifies as to the amount of mortgages being $110,000 on North Point. And later, that's on pages 58 and 59, he testifies about a mortgage on Park being $40,000 on 62 and 63. And he testifies later again on Park about his mortgage monthly payments being $899 in some sense. And then he testifies a mortgage on Lake being $30,000 approximately on pages 63, 64. And he repeats that again on pages 111 to 114. But then he testifies on page 117 that the total amounts of loan outstanding against the land trust is $300,000. Now the approximations he gives on the mortgage only add up to $180,000, but he's saying it's $300,000. So there's something missing there. But then he also put in, pardon me for a moment, he put in the exhibit. He put in exhibit number two. And then he was testifying. In exhibit number two, on page eight I believe it is, he lists the expenses on the property on North Point Drive. And it's at the top of the page where he lists first mortgage and the amount that he's paying, $700 some dollars a month. Second mortgage, the amount that he's paying, $950 a month. So there are two loans on Point Drive. And only one of them is accounted for in the judgment for dissolution. There is in the appendix to my brief two exhibits. One is a balance sheet that was submitted and it's in the exhibit file. It's referred to, it's at pages 828 and 829 in my appendix. It shows $981,966 of property values. And that includes negatives for loans that are there. Three of them listed for the land trust. And then the next two pages, 30 and 31, is a proposed distribution where three of these loans on the land trust are to be assigned out to my client. The problem is there's a fourth loan and it's for a very, very large sum of money, like about $120,000 that's missing. They're not in here and the estate that's being listed here should have come out with a sum of more like $860,000 instead of the $981,000. And I think that's a very serious mistake and I'm so sorry that I have never been able to find it in the record. My client's been telling me about it. I couldn't find it until last night where I found these references in the record. So I understand my problem in terms of waiver, but they're not written about in the record. But there is some documentation in there that there is this fourth loan. Turning then to the other areas, you might- What does this have relevance to, what you just related, the fact that there are expenses? It doesn't, in my mind, seem to have much relevance to whether or not the property was marital or non-marital because I don't necessarily see how the mortgages would prove whether or not they were or weren't marital. It especially wouldn't prove that they were non-marital. They might prove that they were marital if, in fact, she signed on the mortgages as well. I think it would bear more on the- No, I'm not sure that she does not sign on these mortgages. No, I'm saying if she had signed on the mortgages, it probably would have indicated that the judge was correct in determining that this was marital property because I don't know why she would sign on a mortgage on the property if it wasn't marital. Why would she? That's right. I know she does not sign on that. So my point is it may prove that it's marital, but it doesn't necessarily prove that it's not marital property. No, I think it goes more to the maintenance that he has this additional expense. That's the point I'm getting at is that this seems to have some effect on his ability to pay maintenance is what you're arguing. Yes, which is one of the other points of your bill. Now, is it so egregious that it's an abuse of discretion as to what the trial court did? Well, I think when it's coupled with the court, the trial court might have took a shortcut. It took the stipulation filed at the beginning of trial showing a gross income to deal with purposes of setting the maintenance. And there's a lot of evidence put in, including this Exhibit 2, put in at the trial on the second day of trial, where there's a great deal of testimony as to the expenses on these rental properties and on the different houses. And it's also all documented and put in in this really lengthy exhibit. I'm not sure how big it is, but this Exhibit 2 is about 18 pages. And it's partly a form and partly attachments. Did you ever, on behalf of your client, seek to vacate the stipulation? I was never the trial attorney in this. You weren't, I'm sorry. No. Did the trial attorney, whoever that may be, attempt to vacate the stipulation and present the evidence that you just alluded to? Not that I'm aware of, no. Okay. Okay. But there is case law, and I've cited it in my brief, to the effect that when there's a stipulation made, but then there's evidence put in that varies from the stipulation, the court shouldn't rely on that stipulation and ignore the evidence, but instead should go based on what has been produced at trial. I believe that's a case. I'm not sure how you pronounce it, but I call it BOJEC. It's... The image of BOJEC, B-O-J-E-C-I-K. And I only have a Northeast site for it, 838 Northeast 2nd, 282, and what I'm citing is at 290. So I do believe that the court erred by not showing that it was considering these expenses, and I think the court here had an obligation in a sense to figure out the net income and not base its maintenance on the gross income, because it had that before, and I think that's where the court erred. And I think this other thing I brought up just compounds the error as to the maintenance. But isn't the real problem here, counsel, that although it appears that the trial court had some issues of credibility with both parties, bottom line, your client just didn't produce things to back up what he said he was doing. Other than self-made documents, he didn't have bank records, he didn't have, you know, he had his own probably notations from which this exhibit came, but we don't have bank records, we don't have check copies, we don't have, well, you're not going to find a record of how something in a cedar chest, but, you know, if only one thing popped out of a cedar chest, one, but there was something in the refrigerator and something in the garage and in strange places that you can't prove, but then you go to the bank and say, well, I couldn't get those records. I've never heard of a bank not willing to give up records, even though you have to pay for them, but they have them. Okay, I think we're kind of combining in your question two separate issues, and I'd like to address them separately. One, we were talking here about the maintenance, and here in his testimony as to this exhibit, he testifies that this exhibit is made up from the amounts he wrote on the checks during this last year for these properties. So these statements on this exhibit, too, are compiled from the checkbook. Now, the other part of your question is really going to the argument on the mural, versus not mural, for the three pieces of real estate and for the CD or the remains of the CD. And there, when you're saying he didn't put any documentation, no documentation was submitted at the trial to support his testimony, but the court very specifically considered whether it would listen to testimony as a matter of proof for this and decided it would and then heard the testimony. So I don't think you can ignore it. But on bank records, I think you have a misconception. Yes, the bank would give copies of what they have, but what he's going back for in asking for bank records that are then 18 years ago, and they don't keep microfilm that long. They keep it three or four years. They don't have microfilm that they can produce something from 18 years ago. So they cannot produce these items to give to him. They just don't keep them. They're not required to, so they don't. There wasn't, I wouldn't say testimony because it's really remarks of counsel in the colloquy back and forth between the court and counsel as to subpoenaing the banks to get these records and that they don't have these documents anymore because it's too old and they can't produce these checks. So in that sense, yes, the bank would give what it has, but it doesn't have to keep microfilm that far back. So that was not produced. He didn't present a copy of the second mortgage or the promissory note that he had signed. He didn't present a copy of anything in the way of documents concerning any of these three pieces of mural property or the CD. He only presented his testimony, and when I say he, I mean... Isn't that an issue of credibility? Therefore, you've got to be able... You're trying to paddle upstream. I'm definitely paddling upstream. It is... It can be an issue of credibility. However, if you have a witness testify to something, and he's a credible witness, you don't find him to be incredible. You don't find a testimony to be out of the ordinary of what could happen in life that all falls into the way things handle it. You can't ignore that testimony. Now, it would be different if this was a jury case, because a jury, I think, can ignore it, but a trial judge cannot ignore the credible testimony of a witness. The problem is I think we have an unimpeached testimony on these issues. It's only one-sided. There's no kind of evidence that says it's anything different. There is a presumption that the property would be marital. Yes, there is the presumption, and I wanted to get to the presumption also, because the presumption is kind of argued about in the opponent's brief, and I addressed this in the reply too, but there are two different presumptions here, and I think my opponent is arguing about, you know, do you use your efforts to keep up these rental properties and work at them and keep them going and so on? So that shows that they should be treated as marital, but actually there are two separate presumptions written in the statute on that. There's a general presumption that all property acquired during the marriage is marital, and that's in 503B of the statute, but in 503A.8, there's a separate presumption dealing with the income that comes from non-marital property. So even if you have non-marital property, the income from it is presumed to be marital property because it's presumed to come from your efforts and work and so on while you're in the marriage. And so when I see an argument against me that his efforts are going to keep these up so they should be marital property, I think that's misdirected. I'm not overcoming the presumption that the income from these is marital, and I'm not. I'm not even arguing that the income from these three pieces of property should be treated as non-marital income. I've never made that argument, and I'm not making that argument. The rental incomes are marital incomes, but the principle and the investment in the properties itself, I am arguing, are non-marital. And the two of them are stronger, I think, than the third one because they're purchased quickly after the mother's death, at a time when there's no way to explain getting the money except by the gifts from the mother when she died because it's just too much money. I mean, he's spending like five times his annual income in a couple of years. And there's just no explanation other than what he gives that makes any sense. But the third property, which is worth pointing, does come nine years after the death where the other purchases, the first three purchases, all came much earlier. And there's a purchase not involved here because the very first purchase was actually a purchase of a vacant lot and then he hired a contractor and built a house, and he paid for all of that. There's no loans for any of that. Then he buys the second property. Then he sells the house and buys the third property. And it's your position that the cost of the house was also out of an inheritance? He said it was. He said he paid for all of this, hired the contractor and paid for the house and everything out of this, that there's no loans. That's his testimony. There's no counter-testimony. So we've got testimony establishing things within two years of her death of substantial investments in what ends up being 317 Park Avenue and 26-121 Lake Avenue. Now, there was another Lake Avenue that got sold. Mr. Boyle, your time has elapsed. I'm sorry, but you'll have a chance to make rebuttal to Mr. Ostroff. Thank you. Mr. Boyle, may it please the Court. In response to Justice Hutchinson and the issue of the bank records, Mr. Harris did testify that the cash that allegedly was in the refrigerator and the cedar chest was put in the safety deposit box, so there would have been records of him going in and out of the safety deposit box, and those were never produced. And I also don't think that the record here shows that things, documents were sought from the bank, and the bank issued a response saying, we don't keep them or we don't have them anymore. I think that was just Mr. Harris's ad hoc statement at the trial. And the age of some of the records would certainly not explain why he had no records of any of the expenses on the buildings or the mortgages or the checks he wrote or the bills that were issued. All of those would have been, number one, maintained by him, and within the last few years before trial, the bank would have had the records, even if it was their custom to destroy them after a certain period of time. Counsel seems to argue that because the Court accepted that or took the testimony without documentation and that nobody disputed each line of testimony, almost like a line-item veto, therefore the Court must accept that testimony. What's your position on that? Well, I'm not sure whether Your Honor is referring to his testimony that I inherited all this money or here's my expenses on the building. I can address any of it. I mean, I think it goes to all of it. He did produce this document or this number two or whatever it's called that he says is made from records that he has kept. Okay. Talking about document number two specifically, which was his 2007-1102, and then he had a later one, which I think was exhibit one, which he did in 2009. In the one in 2002 on the face page, he lists, puts his gross income at $138,000. Inside, he lists certain expenses that he has or the parties that have on some of these buildings. Now, why would that be viewed any differently than the Schedule C on an income tax return where on the face page of the tax return you put here is my gross income, and that gross income is calculated from, in part, from your Schedule C, which says here's the revenues from my business, here's the expenses against my business, here's the income from my business. So I don't think exhibit number two nor Mr. Harris's testimony, if the court deemed it to be credible, which it didn't, and that's uniquely within the court's province to determine whether it's credible or not, establishes that the expenses from the buildings reduced his income from the amount that he had not one but two 1102s and the amount that he stipulated to that was his income. In the 2007 1102, which did list expenses, he said my gross income is $138,000. Then he stipulated, entered into a stipulation, which was never sought to be vacated, that my gross income is $132,000. Now, that stipulation was two years after the initial affidavit, so maybe his income changed, and 132, I believe, is also the number on his 2009 financial affidavit. So he three times submitted documents saying my gross income from which maintenance is generally calculated because it's tax-deductible to the payer and declared as income by the recipient. He three times said my gross income ranges between $132,000 and $138,000. He is bound by his stipulation. The court did give him the courtesy, I guess you could say, of allowing him to testify that I did list all these expenses on my first financial affidavit, but he had no documentation. And that, along with the fact that the very same document, there's no way to say that those expenses weren't subtracted by him before he got to the $138,000 number. So generally speaking, and I know that my opponent brought up a new issue here today, and I'm not going to respond to it. That's up to the court. But generally speaking, I'm not, especially in the trial court, a form over substance kind of person. If people need more time to do things, I'm not somebody who stands in their way. But this is asking for chaos here, I think, is what this appeal basically attempts to do. If one looks at Mr. Harris's exhibit list, there is absolutely not one exhibit that vindicates his claim that he inherited the money. And the court, I think, in the trial court, too, looked at this. He said there were exhibits. He said, my attorney, Sarmad, has all this documentation. And also I have the safety deposit box. And I bought this CD. And none of it was given to the court. So the court ends up saying, I don't believe you. I'm not taking your word for these things. Mr. Harris's burden on non-marital property claims was to prove by clear and convincing evidence, A, that he inherited the money, and he didn't do that, and B, that the money he inherited was the money that bought the property and maintained it all through the marriage. And he had no documents to prove that either. Now, Mr. Voto was talking about the mortgages. And, you know, even that was a moving target when Mr. Harris was testifying. Actually, what I heard in the initial argument here was that there are $180,000 in direct mortgages on certain properties. And then there's a $150,000 line of credit against the beneficial interest in the land trust, which includes all the properties. And so, clearly, if Mr. Harris wanted to establish these were non-marital, he can't establish that the money that maintained these properties was non-marital money. Both parties were earning incomes during the marriage, work was done on the properties during the marriage, and he simply did not meet the burden of proof that is required of him. All the properties were acquired during the marriage. The presumption becomes his marital property. The only way that presumption can be overcome is by clear and convincing evidence. And the Court, finding that there was no documentation regarding any of these claims, and actually sort of begging Mr. Harris to produce some, was certainly within the Court's authority to find a clear and convincing evidence hadn't been produced, and the Court was not required to take Mr. Harris's word for it, especially after it found him to not be credible. Now, also on the amount of the income, which is the expense issue, the Woja case, that involved a sub-I.R.A. That's the case where they are saying that if there's undisputed testimony, that fell within the stipulation. The Woja case was a sub-I.R.A., and the parties had stipulated to a certain value, but then there was a document which showed the Court that that value had been wrong, and both parties agreed it's a different, you know, they agreed to the authenticity of the document. Here, what we have is a stipulation to a certain amount of income, and documents, the only documents that were submitted, verify the numbers in the stipulation, which are the two 1102s submitted by Mr. Harris. Also, I do want to point out that in the judgment, and I don't know if this is from the missing pages in the judgment, I don't think so, but two of the properties that Mr. Harris complains about were awarded to him anyway, the lake property and the property on 317 Park. He, in his brief, this wasn't brought up in the oral argument, but in his brief he talks about he's ordered to sell some of the properties, so the income from those properties shouldn't be included anymore, and Mrs. Harris can earn income off of the property she got, although there was no evidence of that. Just like any other maintenance payor, Mr. Harris is entitled to come to court if those properties indeed sell and aren't producing income anymore, to show what happened to the money and why the properties that he had generated X amount a month can no longer do so, and he can also try to show that Mrs. Harris has started to generate income from the property she received, but at the time the judgment was entered, and I have an apology to make here too, the court took the evidence that it had before it, said that his income was $132,000 a year, and hers was $29,000 a year. It then awarded her $32,000 a month in maintenance. Now, in my brief on page 15, I said that the difference was $102,000 a year, and then for some reason I said that was $579 a month, which is clearly wrong. It's $8,554 a month. And after the payment of maintenance to Mrs. Harris by Mr. Harris, his gross income is $93,600, and hers is $67,400. I do not see how that can be characterized as an abuse of discretion. So in sum, I think that the court relied upon the evidence that was submitted and the evidence that was not submitted and assessed the credibility of the witnesses, that it's determination that Mr. Harris did not need his burden of proof with regard to those items being non-marital property. The court was correct. He did not need his burden of proof. And with regard to the maintenance, based on the evidence before the court and what the incomes of the parties are going to be and the opportunity to modify if those incomes change, I do not believe that an abuse of discretion occurred. Thank you. The trial court was consistent, wasn't she, in that in some cases where your client didn't have certain documentation, she also decided not that she was not credible but put it back in the estate. Right. It wasn't that she just took Mr. Harris and said, well, you haven't done what you're supposed to do. She looked at all of the evidence that had been produced. Correct. On the items that she found to be my client's non-marital property, that was either stipulated by the parties that it was her non-marital property or she produced documents of accounts that she had shared with her parents and then the new statements after her parents' death that the money had been transferred to her, where she was not able to produce evidence of her claims. Those things were not sustained. Thank you. Thank you. Mr. Baldwin. I think the biggest problem I have here is really that I think my client approached this trial as though this was a procedure where the goal was to see that justice was done and failed to recognize that trials are adversarial procedures and my client was not well prepared in the trial court in that regard and had a misconception. And so I think the record is lacking and I have to deal with it as an appeal as to what it is and where I'm at now. So all I have on the merit is testimony and no documentation. Doesn't the testimony seem to imply that he didn't have any documentation, that he didn't have any documentation, his accountant didn't have any documentation, the banks didn't have any documentation, virtually there was no documentation? No, it does not imply that. In fact, he states in his testimony that there were documents sent to opposing counsel, that they were given to opposing counsel and he hasn't them. And it appears as though my client thought the opposing counsel had an obligation to bring them forth. Is it your position that your client sent the originals to opposing counsel and didn't keep a copy? I cannot say that at all. But my client clearly has said in the transcripts that these documents were given to opposing counsel. But respectfully, how does that explain that he no longer has? I can't explain that. I have no good explanation for that. Because my client was also represented by counsel. And while it was a replacement counsel, that counsel was in the case for, I believe, over 11 months before trial. So I cannot give you a good explanation. I wish I could. There is a misstatement here, not a very important one, about a 2002 affidavit, I think. It was a 2005 affidavit when the case began. But also, you talked about the need to show that we maintain the properties as non-mural. And I don't believe that's the case at all. I believe the Supreme Court, in the Mary J. Wilson case, 92nd Illinois 2nd, 432, 440 to 441, and it's in my brief, addresses the issue that if you have non-mural property, the fact that you use some marital funds or efforts to maintain these and keep them up and so on, does not cause a transmutation of those non-mural properties or assets into marital just because you do that. You're not doing something that's increasing their value at the expense of the marriage or something. You're just keeping them up. And I think that really goes to what I was saying before. I'm not contending the income from these was non-mural. Well, the trial court could have looked at his contributions to those properties and said, all right, the marital estate is entitled to some money back. They're still his properties, but the marital estate might be entitled to some reimbursement. But I think didn't basically the trial court say without, I mean, implicitly without verification or foundational information, I can't even do that. I think the trial court basically did rule that without documentation, he did not prove these were non-mural. I think that's the basic holding of the trial court. Now, counsel also addressed the fact that my client received two of these properties, the Lake Avenue and the Park Avenue, but receiving them in a mural distribution is far different than having them as non-mural because, in effect, you're having to set off half their value towards the spousal, in this case, 45-55 distribution. But you have to set it off. So it's not the same saying that he got them anyway. And I do think the case is much stronger on those two properties than it is on the third. And I think it's also strong on the CD. There's nothing contradicting that he had this investment money in fund going back to 1990, and he kept it up to the time when they were going to trial. And at the time they were in the legal proceedings, he had $80,000 still left in that, and the court ordered him to pay out $40,000, $20,000 on each side, which he did. And that order is in November of 2007. So we're talking about $80,000 then, but that's not the initial amount of the CD, but that's what it was worth then. But at the time of this distribution or trial, it was $37,000, I think $800 something. And we are contending that $37,800 is non-mural, that CD. And that's different even than properties. I mean, it's still testimony, but I just think the case is far stronger on the Park Avenue and the Lake Street property than it is on the North Point, which comes nine years after the death of his mother versus the others. And also, I think it's stronger on the CD. But on the maintenance, I also feel he's – I don't think he got a fair shake on maintenance. I don't think the court properly looked at what his income and ability to pay was when it only dealt with the issue of gross income. And it had his other evidence in front of him. And you mentioned this. This is – it's given to him, I was looking for it before. It's 24 pages. It is admitted in the evidence. It's not filed like the other affidavit was filed or the stipulation was filed. This was not filed, so it's not – it doesn't have a clerk's number. But it is in the exhibit folder. It was admitted into evidence at the trial. And he did testify that this is made up from the checking account. But this exhibit only goes to the issue of maintenance. It has nothing to do with marital versus non-marital. It only deals with what the expenses were during the one calendar year. And so I'm only bringing this exhibit two up. The maintenance of the affidavit. Thank you for your time. Thank you. Your time is up if you wish to close. I think you've pretty well closed. I have. Thank you, Your Honor. Okay. Thank you. The case will be taken under advisory.